**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **ANTHONY P. LANE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 09 C 3277** |
| ) | |
| **MICHAEL J. ASTRUE, Commissioner,** ) | **Judge Rebecca R. Pallmeyer** |
| **Social Security Administration** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Anthony Lane brings this action under 42 U.S.C. § 405(g) seeking reversal or remand of the decision by Defendant Michael J. Astrue, Commissioner of the Social Security Administration, denying Plaintiff's disability claim. Plaintiff claims that he was disabled for the closed period from April 15, 1998, through January 1, 2000, due to major depressive disorder, posttraumatic stress disorder ("PTSD"), and panic disorder with agoraphobia. The Commissioner also denied Plaintiff's claim predicated on physical disabilities, including carpal tunnel syndrome, a pelvic fracture, a jaw fracture, hernia repair, and nerve damage in his neck; Plaintiff does not challenge that determination.

Plaintiff challenges the adverse disability determination for his mental impairments on three grounds. First, Plaintiff argues that the ALJ failed to follow the "special technique" for evaluating Plaintiff's mental impairments set forth in 20 C.F.R. §§ 404.1520a, 416.920a. Second, Plaintiff argues that the record, taken as a whole, does not contain substantial evidence to support findings that the Plaintiff was not disabled. Specifically, Plaintiff claims that the Administrative Law Judge ("ALJ") gave insufficient attention to certain medical records and personal testimony related to Plaintiff's psychological condition, and that the ALJ did not properly assess Plaintiff's credibility. Finally, Plaintiff claims that the ALJ erred in concluding that Plaintiff's mental impairment did not

meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1").

The court concludes that remand is necessary due to the ALJ's failure to evaluate Plaintiff's mental impairment according to the "special technique." This failure is particularly disappointing in light of the fact that a federal judge who reviewed an earlier decision in this case specifically directed that the technique be employed on remand. Still, because Plaintiff himself raised this matter for the first time in his reply brief, the court will stay the remand order briefly in order to give Defendant an opportunity to respond, should he choose to do so.

## BACKGROUND[1]

Plaintiff was thirty-seven years old when his disability period allegedly began on April 15, 1998.[2] Plaintiff had completed the eleventh grade, and served in the national guard from 1984 to 1992. (R. 38-39.) Since his discharge from the military, Plaintiff lived in Chicago, Illinois, until 1997 (R. 541); Cleveland, Ohio, from 1998 to 2000 (*id.*) (during his alleged period of disability); and Little Rock, Arkansas, from 2000 until his return to Chicago in 2009. (May 28, 2009 Order [59].) Prior to the onset date of his alleged disability, he had held a number of jobs, including general laborer, mechanical inspector, garage attendant, punch press operator, and shoe salesman. (R. 84, 105-09.) Immediately prior to the period in which he claims disability, Plaintiff worked as a "skilled general laborer" at Lake Land Temporaries, an employment service in Cleveland—a position he had held since October 1997. (R. 78, 96.)

Plaintiff experienced a series of unrelated violent events in the years prior to, and during, his alleged period of disability. First, on August 14, 1994, while Plaintiff was completing a security

---

[1] The following statement of facts is drawn from the administrative transcript, cited here as "(R. __ )."

[2] Although Plaintiff originally alleged that his disability period began on February 11, 1998 (R. 74), ALJ Rebsamen later determined that Plaintiff was engaged in substantial gainful activity until April 14, 1998 (R. 245), a finding that Plaintiff does not challenge here.

inspection in the parking lot of the condominium building where he worked, a coworker struck him with a car suddenly and without warning, causing injury to Plaintiff's neck, back, and legs.  (R. 345.) Plaintiff believed that his coworker had acted intentionally.  (*Id.*)  Then, on July 26, 1995, Plaintiff was physically attacked by a different coworker, causing injury to Plaintiff's jaw, neck, back and arms.  (R. 311-12.)  Plaintiff also testified that sometime in 1996, he discovered the dead body of a friend and was considered a suspect in the death.  (R. 238, 536, 544.)  Plaintiff did not elaborate on the details of the incident, and neither Plaintiff's therapist nor his treating psychiatrist made any reference to this incident in Plaintiff's medical records.  Finally, on August 20, 1998, Plaintiff sought treatment at Meridia Huron Hospital in Cleveland, Ohio for injuries, mostly bruises and abrasions, to his ribs, pelvis, legs, and hands.  (R. 115, 405-06.)  Plaintiff claims that muggers with shotguns had broken into his home and assaulted him the previous day.  (R. 115.)

## I.      Medical History

Plaintiff filed his initial disability claim in Ohio on Febrary 23, 1998.  On September 1, 1998, Dr. Kenneth R. Felker completed a psychological examination of Plaintiff at the request of the Commissioner concerning that claim.  (R. 139, 237, 239.)  Dr. Felker noted that when asked about his disability, Plaintiff "listed a host of physical and medical conditions," including carpal tunnel syndrome, nerve damage resulting from the 1994 automobile accident, a chronic stomach condition, and back and neck problems from the assault in 1995.  (R. 140.)  Plaintiff also told Dr. Falker that he suffered from mild depression but did not require medication; he denied any past psychiatric hospitalizations or individual counseling.  (*Id.*)  Plaintiff identified his physical pain as the reason he "ha[d] difficulty concentrating and being around people."  (*Id.*)  Plaintiff also mentioned that he had "problematic" sleep patterns and experienced weekly crying spells.  (*Id.*)

Dr. Felker acknowledged that Plaintiff exhibited "evidence of mild depression," but the doctor saw no signs of "undue anxiety"; no evidence of delusional, paranoid, or grandiose thinking; and no history of hallucinations.  (*Id.*)  Plaintiff's recall ability was reportedly "below average" and his

insight and judgment were "marginal." (*Id.*)  Based on Plaintiff's description of his living description (at the time, Plaintiff lived with his aunt, who assisted Plaintiff in the maintenance of his daily needs) and history of erratic work, Dr. Felker doubted Plaintiff's assertion that he could manage his affairs independently, but noted that Plaintiff's daily activities included showering, getting dressed and drinking coffee, reading the paper or watching TV, "'tr[ying] to find something to occupy [his] mind,'" making important phone calls or seeking employment opportunities, and performing "light household duties." (*Id.*)  Dr. Felker also administered a series of intelligence, memory, and reading comprehension tests, and determined that Plaintiff had average intellectual functioning, average memory function, and reading comprehension ability at the twelfth-grade level. (R. 141.)  Dr. Felker concluded that Plaintiff suffered from (i) "mild restriction in his ability to concentrate and attend to tasks"; (ii) no significant restriction in his ability to follow routine instructions; (iii) mild impairment in his "ability to relate to others and deal with the general public . . . due to his somatic preoccupation and tendency to socially isolate"; and (iv) moderate impairment in his "ability to relate to work peers, supervisors[,] and deal with stressors in the workplace . . . due to his somatic preoccupation." (R. 142.)[3]

Dr. Vicki Casterline, a non-treating and non-examining state-agency psychologist, reviewed the record evidence in Plaintiff's case on September 24, 1998, and completed a Psychiatric Review Technique Form ("PRTF"). (R. 153.)  She noted that Plaintiff was "preoccupied with his physical complaints" and that his "[a]ctivities [were] minimally reduced," but concluded that Plaintiff's impairments were not severe. (R. 154.)  Specifically, in comparing Plaintiff's impairments to those listed in Appendix 1,[4] Dr. Casterline looked to Listing 12.07 for Somatoform Disorders. (R. 158.)

---

[3]     "Somatoform" is defined as "denoting physical symptoms that cannot be attributed to organic disease and appear to be of psychic origin."  *Dorland's Illustrated Medical Dictionary* 1734 (32d ed. 2012).

[4]     Appendix 1 to Subpart P of 20 C.F.R. Part 404 provides a list of all the medical
(continued...)

Under category A of this listing, Dr. Casterline indicated that Plaintiff had "physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms, as evidenced by . . . psychological factors affecting [his] physical condition." (R. 158.) Under category B, she marked that Plaintiff had a slight restriction in activities of daily living; slight difficulties in maintaining social functioning; deficiencies in concentration, persistence, or pace that seldom resulted in failure to complete tasks in a timely manner; and no episodes of deterioration or decompensation in work or work-like setting that caused him to withdraw from that situation or to experience exacerbation or signs and symptoms. (R. 160.) Dr. Casterline did not indicate that any of these functional limitations were manifested at the requisite degree to satisfy Listing 12.07. (R. 160.)

Throughout 1999, Plaintiff received treatment from Leann Gardner, a therapist at Meridia Huran Hospital's behavioral medicine department in Cleveland, Ohio. On January 18, 1999, Gardner completed an Integrated Assessment of Plaintiff as part of the "pre-admission screening" process at the hospital. (R. 465-74.) Plaintiff reported that he hoped to gain from treatment a reduction in his anxiety and "something to help [him] relax," and to have information sent to his lawyer, presumably in support of his disability claim. (R. 465.) Plaintiff described having severe anxiety and depression accompanied by chest pains, headaches, and sleep disruption. (*Id.*) Gardner's report noted that Plaintiff's mother had been diagnosed with paranoid schizophrenia and his father with manic depression. (R. 467.) Plaintiff told Gardner that he was living with his

---

[4](...continued)
conditions that may constitute disability under the Social Security Act. Appendix 1 also prescribes how these medical conditions must be documented in order to meet the requisite level of severity to constitute a "disability." For each of the Appendix 1 listings relevant to this case, there are three different categories of criteria: "A criteria," which provide a set of medical findings; "B criteria," which provide a set of impairment-related functional limitations; and "C criteria," which provide additional functional considerations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A). Each listing in Appendix 1, section 12.00 *et seq.* specifies how many criteria from each category (A, B, and C) a claimant's impairment must meet in order for the impairment to satisfy that particular listing.

cousins, had served in the military, and occasionally attended church.  (R. 468.)  Plaintiff's leisure activities included writing and watching TV, but he reportedly spent most of his time "working" on his disability claim.  (R. 469.)  Plaintiff was reportedly able to care independently for his grooming and hygiene, prepare basic meals, perform household tasks, make appointments, and take medications.  (R. 471.)  Gardner recorded the 1998 break-in as a traumatic events in Plaintiff's life.  (R. 472.)  She also noted his sleep disturbances and insomnia, social isolation ("pretty much in house"), twice-weekly panic attacks, forgetfulness, and frequent agitation.  (R. 476.)  Gardner anticipated that Plaintiff would need six to eight therapy sessions.  (R. 470.)

Plaintiff did not comply well with this therapy, however.  Throughout the course of his therapy, Plaintiff repeatedly cancelled, missed, or arrived late to appointments.  (R. 174, 218, 220-21, 372, 377-78, 382, 385-86, 514.)  On February 3, 1999, Gardner spoke with Plaintiff about his frequent missed appointments and perceived Plaintiff to be "very defensive" during this conversation.  (R. 200.)  Plaintiff told Gardner that she "[did not] know what he has been going through."  (*Id.*)  Plaintiff told her, further, that he became irritated when the therapy sessions were not "hands on," and asked Gardner how many more times he needed to see her before he could meet with the psychiatrist for "diagnosis and treatment" (services he perhaps believed Gardner could not provide).  (*Id.*)  As Plaintiff seemed to have "a difficult time comprehending" the concept of therapy, Gardner explained the importance of investment in the therapy process and warned Plaintiff that she could not continue to see him if he missed another appointment.  (R. 201.)  Plaintiff explained that he had transportation problems, a problem he had not mentioned to Gardner before.  (R. 200.)  In Gardner's view, Plaintiff had "little investment in therapy"; she noted her "concern[ ] that his motivation [was] court-related only," particularly because of their conversations about sending paperwork to Plaintiff's lawyer and his demand for "diagnosis and treatment."  (R. 200-01.)

At Plaintiff's next therapy session, on March 1, 1999,[5] Plaintiff reported that he continued to experience symptoms of decreased socialization, increased startle response, sleep disturbance, nightmares, anxiety, and mood depression. (R. 382.) He acknowledged, however, that he was able to go places independently without panic attacks or agoraphibia. (*Id.*) Gardner noted that Plaintiff continued to focus on his disability claim, and that he was "putting other goals 'on hold' until results." (*Id.*) Gardner discussed treatment for PTSD, and Plaintiff told her that "he [was] now committed to treatment." (*Id.*)

On April 1, 1999, Plaintiff saw a psychiatrist, Dr. Mark Zedar. In his report, Dr. Zedar noted that Plaintiff was "difficult during the interview process" because he "was quite circumstantial in his description of his complaints." (R. 175.) Dr. Zedar reported that Plaintiff described a "history of years of panic" accompanied by "palpitation of the heart, shortness of breath, and chest pain." (*Id.*) Dr. Zedar recorded that Plaintiff had "two to three episodes [of panic] per week and has agoraphobia"; that he had been depressed since 1994 or 1995 with symptoms of "hopelessness, helplessness, worthlessness," and interrupted sleep; and that Plaintiff's father had been diagnosed with bipolar disorder. (*Id.*) Plaintiff also reported "a history of PTSD symptoms, includ[ing] flashbacks, nightmares, [and] always looking over his shoulders," and told Dr. Zedar about the "violent" traumas he had experienced in the past. (*Id.*) Dr. Zedar nevertheless described Plaintiff as "pleasant and cooperative," with full affect; he noted Plaintiff's spontaneous speech, lack of looseness or hallucinations, and intact insight and judgment. (R. 176.) Dr. Zedar concluded that Plaintiff suffered from mild to moderate major depressive disorder, PTSD, and panic disorder with agoraphobia. (*Id.*) Dr. Zedar prescribed Remeron, an anti-depressant, and Zyprexa, an anti-psychotic. (R. 176, 191.)

---

[5]     Gardner's note lists the date as "3/1/98," but he court infers that the appointment actually occurred on March 1, 1999, because Plaintiff did not begin therapy with Gardner until early 1999.

Plaintiff reported satisfaction with the medication on a number of occasions, and both Gardner and Dr. Zedar continued to see overall improvement in Plaintiff's condition. On May 7, 1999, Dr. Zedar observed that Plaintiff was "more calm" though he occasionally felt "hopeless, helpless, and worthless." (R. 190.) Plaintiff continued to have panic attacks once per week, but noted that these attacks were more in control. (*Id.*) On May 20, 1999, Plaintiff stated, "the medication is working well" and denied any side effects. (R. 188.) As of June 17, 1999, Plaintiff reported that he was "very happy" with Zyprexa and "satisfied" with Remeron, and described his mood as good. (R. 183.) Plaintiff identified dry mouth as the only uncomfortable side effect of the drugs. (*Id.*) The nurse also reported that the Lilly Cares Foundation, a patient assistance program sponsored by Eli Lilly & Co., approved Plaintiff's application for assistance for Zyprexa. (*Id.*)[6]

On July 8, 1999, Plaintiff reported that he "fe[lt] depressed at times." (R. 179.) On July 30, 1999, Gardner described Plaintiff's mood as depressed, and Plaintiff expressed feelings of shame and guilt. (R. 173.) Gardner also wrote, "Concerned about shame . . . paranoia . . . [and] flashbacks." (*Id.*) There were hopeful signs as well, however: On August 9, 1999, Dr. Zedar noted that Plaintiff described himself as "OK I guess," and reported fewer worries and flashbacks, as well as improved sleep. (R. 172.) Plaintiff described his mood as "good, hopeful" and his sleep as "good"; he "believed treatment to be effective," though he expressed concern about his SSD application. (R. 170.) On August 25, 1999, Gardner noted that Plaintiff's sleep, appetite, and affect/mood were "improved" and Plaintiff felt "hopeful." (R. 169.) Though Plaintiff was still focused on his disability claim, he informed Gardner that he was thinking about going back to school or work. (*Id.*) On September 2, 2009, Plaintiff reported that he was "very happy" with the "effect of [the] medication," and felt that he had "started getting [his] life together." (R. 167.)

---

[6]     The duration of this assistance is uncertain from the record; another application for assistance from that program was sent on August 13, 2009. (R. 167.)

The records continue in this vein, reflecting that Plaintiff's treatment was effective, but did not eliminate his symptoms. On September 27, 2009, Gardner observed that Plaintiff's mood and appetite were improved, but that he continued to have nightmares and weekly panic attacks, and that he had stayed in his home two days without leaving the previous week. (R. 518.) That same day, Plaintiff told Dr. Zedar that he felt "pretty good." (R. 517.) He reported having a panic attack when leaving his house that day and, although the panic attacks were now mild, he continued to experience agoraphobia and flashbacks. (*Id.*) Three weeks later, on October 18, 1999, Dr. Zedar noted that Plaintiff had been sleeping and felt hopeful about the future, though he continued to feel depressed, uncomfortable with relationships, and had occasional flashbacks. (R. 515.)

On November 10, 1999, Gardner noted that Plaintiff continued to be isolated and felt a lack of confidence in social situations, but also observed that Plaintiff's speech, posture, and depression were improving, and that he planned to spend Christmas with family in Arkansas. (R. 514.) She discussed with Plaintiff the termination of his treatment with her, but noted a plan to refer Plaintiff to another therapist if needed. (*Id.*) Gardner's assessment on that day recorded that Plaintiff suffered from the following symptoms: moderate anxiety (where "moderate" severity fell at level 3 on a scale ranging from 0 for "not present" to 5 for "severe"); moderate emotional withdrawal; mild tension; moderate depressive mood; severe suspiciousness (including "mistrust, belief that others harbor malicious or discriminatory intent"); and mild blunted affect. (R. 477.) Symptoms that Plaintiff did not display included somatic concern, grandiosity, hostility, hallucinatory behavior, motor retardation, and disorientation. (*Id.*)

On November 29, 1999, Dr. Zedar noted that Plaintiff felt "OK," that his sleep was good, and that his energy was "so/so–moderate." (R. 511.) Dr. Zedar also reported that Plaintiff "doesn't do anything during the days," except occasionally go to the store up to once a day. (*Id.*) Plaintiff told Dr. Zedar that he had gone out with his family the previous weekend to a sports bar and continued doing his own cooking and cleaning. (*Id.*) Dr. Zedar noted, however, that Plaintiff continued to

have nightmares and flashbacks concerning the home intrusion. (*Id.*) He also reported having panic attacks once or twice per week, lasting ten to fifteen minutes, with symptoms including fear, heart palpitations, and withdrawal. (R. 513.)

At his final appointment with Gardner, on December 13, 1999, Plaintiff came with his Social Security denial notice in hand. (R. 510.) He questioned Gardner's assessment, as reported in the letter, that he had not complied with treatment, and challenged her credentials. (*Id.*) Gardner reminded him of the multiple occasions on which they had discussed his "lack of commitment to treatment as evidenced by multiple missed appointments and recurrent initial focus on what his diagnosis was or when his evaluation would be finished." (*Id.*) Gardner provided Plaintiff with the names of several therapists who specialized in treating PTSD and offered to make an appointment for Plaintiff, but Plaintiff declined, stating that he would make the appointment for himself. (*Id.*) Plaintiff also announced that he was planning to return to work because "financially he [could not] afford not to." (*Id.*) In the last record from Dr. Zedar, dated January 3, 2000, Zedar noted that Plaintiff was still taking his medication, and would be seeing a new therapist. (R. 509.) Plaintiff reported that he continued to have up-and-down days and continued to get panic attacks approximately once or twice per week, depending on stress. (*Id.*)[7]

## II.    Procedural History

On February 23, 1998, Plaintiff filed an application with the SSA for Title II DIB and Title XVI SSI, alleging an inability to work since February 11, 1998, because of carpal tunnel syndrome, pelvic and jaw fractures, nerve damage in his neck, and depression. (R. 74, 237.) The SSA denied

---

[7]    Plaintiff underwent an additional psychological consultative evaluation with a clinical psychologist, Dr. Sam Boyd, at the request of the Commissioner on December 31, 2003. (R. 301-08.) Dr. Boyd's evaluation is not relevant to the issue presented in this case because this evaluation took place almost four years after Plaintiff's alleged closed period of disability ended. Dr. Boyd concluded that due to "borderline intelligence," Plaintiff had "moderate" restrictions in his ability to "understand and remember detailed instructions" and "carry out detailed instructions," and a "moderate" restriction to "interact appropriately with the public." (R. 309-10.)

Plaintiff's application initially on the grounds that he was earning an average gross monthly salary of $832, which exceeded $500 per month and thus constituted substantial gainful employment. (R. 60-64.) On reconsideration, the SSA again denied Plaintiff's claim after finding that he did not have any severe physical or mental impairments that would prevent him from working. (R. 66-68.) Plaintiff then filed a request for a hearing (R. 70), which was held on October 26, 1999, before ALJ Arthur E. Jacobson. (R. 11, 17.)

## A.  First Administrative Hearing

At the hearing before ALJ Jacobson in Cleveland, Ohio, Plaintiff was represented by counsel and testified to the following relevant information. (R. 36.) Plaintiff lived with his two cousins, aged 21 and 22. (R. 50-51.) He had completed the eleventh grade and received some vocational training while in the military. (R. 39.) On a typical day, Plaintiff did "not much" and "pretty much stay[ed] to [him]self." (R. 46.) He was able to clean the kitchen, wash dishes, run the vacuum, and do some cooking. (R. 46.) Plaintiff "hadn't done much lately" by way of hobbies, and when asked about his community activities, he stated that he "read his Bible daily." (R. 46-47.) Although Plaintiff had a driver's license, he did not drive and did not own a car. (R. 47.) Plaintiff had just received a medical card from the state. (R. 48.)

Plaintiff served in the military from 1984 or 1985 until 1992 and worked in shipping and receiving for a steel company from 1990 until 1991. (R. 39.) Later, Plaintiff parked cars at a condominium building in Chicago for approximately three and one-half years. (R. 40.) From 1996 until 1997, Plaintiff worked as a mechanical inspector for the Greater Chicago Auto Auction. (R. 41.) His last full-time job was with Lake Land Labors in Cleveland, where he served as a "wood inspector" for about six months. (R. 41.) Thereafter, Plaintiff worked with Lake Land Temporaries, which placed him in temporary day labor assignments. (R. 41, 96.) Plaintiff contends that he stopped working for this company on April 14, 1998, "when he became unable to work due to severe anxiety and panic attacks." (Pl.'s Mem. at 3.)

11

Plaintiff testified that he had "been kind of stressed out" lately with anxiety and "ha[d]n't really been focused." (R. 40.) In response to the ALJ's question about why Plaintiff was unable to work at that time, Plaintiff listed his carpal tunnel, anxiety, depression, and panic attacks as reasons. (R. 43.) Plaintiff stated, "In August of last year I had a home invasion and nearly lost my life. That trial just ended. . . . I was traumatized. I'm on medication, and my physical health is not . . . as best as it could be. I have limitations. I'm just not the same." (R. 43.) Plaintiff also mentioned that he was being seen by Dr. Zedar and counseled by Gardner at the time. (R. 44.) When asked about his current medications, Plaintiff testified that he was taking Remeron for sleep and Zyprexa for anxiety, depression, and panic attacks. (R. 46.) He noted that his sleeping was "an on and off thing," although at the time, he was "doing better, because of the Remeron." (R. 49.) Plaintiff also noted that his bedtime depended on whether he had a panic attack on a given day. (*Id.*) Before visiting Dr. Zedar, Plaintiff had panic attacks at least two to three times per week; since starting therapy, however, he was having such attacks approximately once per week. (*Id.*) When asked whether there was "any particular reason or incident that caused" the panic attacks to occur, Plaintiff responded as follows:

> I think it was a combination of things. I think it was the automobile accident . . . in '94. I think it was the assault on the job in '95. I think it was the death of my father in '91. I think it was the death of my friend when I found him upstairs in his house in '96. I think it was the death of my cousin. She just recently passed in the house I'm living in now in '98. I think it was the home invasion in August of '98 when I had looked down a shotgun, yes.

(R. 49-50.) Plaintiff reported that he had difficulty concentrating and became frustrated with simple tasks, such as reading the newspaper. (R. 50.) Plaintiff was able to ride the bus to the hearing, however, and despite some nervousness, "felt pretty good" about the experience. (*Id.*) He testified that he left his house "for periods of time, maybe once a week," usually to go to the store. (*Id.*) He did not consider himself a confrontational person. (R. 51.) The ALJ asserted that Plaintiff "seem[ed] to have some problems answering questions directly." (R. 45.)

A vocational expert ("VE"), Karen MacGuffie, also testified at the hearing. The ALJ asked McGuffie to assume

> an individual who is less than 39 years of age and who has an 11th grade education and who has the work background that you have described . . . and this individual has no physical limitations. And this person has non-exertional limitations that the job should not require understanding, carrying out, or remembering more than simple instructions. The jobs should not require more than occasional contact with supervisors, co-workers, or the public. And finally, the job does not require more than occasional changes in the work setting. Would this person be able to do any of his past relevant work?

(R. 55.) MacGuffie testified that with those restrictions, Plaintiff remained capable of resuming his past jobs as an inspector or parking garage attendant. (R. 56.) Further, given that "hypothetical vocational profile," MacGuffie testified, Plaintiff was capable of performing seventy percent of unskilled work in the national economy that included medium, light, sedentary, and even heavy exertion, incorporating "several thousand jobs in this region." (*Id.*)

On November 16, 1999, ALJ Jacobson issued a written decision denying Plaintiff's request for benefits. The ALJ determined that Plaintiff was not disabled under the Social Security Act, as Plaintiff was able to perform his past relevant work as a garage attendant, parking attendant, and shipping and receiving inspector. (R. 17.) The ALJ concluded that Plaintiff had the "residual functional capacity to perform work-related activities except for work involving more than [certain nonexertional limitations]: occasional changes in the work setting; occasional contact with supervisors, co-workers, or the public; and understanding, remembering, and carrying out of simple instructions." (*Id.*) When the SSA Appeals Council denied Plaintiff's request for review on January 7, 2002, ALJ Jacobson's decision became the final decision of the Commissioner. (R. 5-6.)

**B.      United States District Court for the Western District of Arkansas**

Plaintiff, who had moved from Ohio to Arkansas since filing his disability petition, subsequently filed a civil action in the U.S. District Court for the Western District of Arkansas. On May 27, 2003, that court adopted the report and recommendation of then-Magistrate Judge Bobby E. Shepherd,[8] remanding Plaintiff's case to the Commissioner for further consideration pursuant to 42 U.S.C. § 405(g). (R. 254.) Judge Shepherd noted that the ALJ failed to "specifically set forth the plaintiff's physical and mental imitations, along with the physical and mental requirements of the plaintiff's past relevant work" in order to "adequately compare the claimant's residual functional capacity with the demands of the past work to determine whether the claimant is capable of performing the relevant tasks." Magistrate Judge's Report and Recommendation, *Lane v. Barnhart*, No. 02-6053, slip op. at 7 (W.D. Ark. May 9, 2003) (citing *Groeper v. Sullivan*, 932 F.2d 1234, 1239 (8th Cir. 1991); *Kirby v. Sullivan*, 923 F.2d 1323-27 (8th Cir. 1991)). Judge Shepherd explained that reliance on the vocational expert's testimony did not excuse the ALJ's failure to engage in the required analysis. *Id.* The judge also stressed that on remand, the ALJ should consider Plaintiff's "nonexertional limitations," including depression/anxiety, PTSD, insomnia, panic attacks with agoraphobia, and inability to concentrate/focus. *Id.* at 5, 7-8. In summarizing the applicable law, the judge referred to the "special procedure" for assessing claims of mental impairment, required by 20 C.F.R. § 404.1520a, including the preparation of a PRTF. *Id.* at 4. As explained more fully below, SSA regulations require the ALJ to apply a special technique, rating the functional limitation of a claimant's mental impairment on "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

## C. Second Administrative Hearing

---

[8]      Judge Shepherd now sits on the Court of Appeals for the Eighth Circuit.

On remand, the SSA Appeals Council vacated the decision of ALJ Jacobson and forwarded the case to a different ALJ, Donald R. Rebsamen, for further proceedings. (R. 252.) By the time of the hearing before ALJ Rebsamen in April 2004, Plaintiff had resumed working. He alleged that he had been disabled from March 1998 through January 1, 2000, and he sought DIB and SSI benefits for that closed period. (R. 533-34.) He testified that during the alleged period of disability, he was living in Cleveland, Ohio with his cousins. (R. 541.) He affirmed the truth of his testimony at the 1999 hearing, and, though he suggested that the transcript from that hearing reflected incorrectly transcribed statements, he did not specify which statements were inaccurately transcribed. (R. 543.)

When asked by the ALJ what rendered Plaintiff disabled during the claimed period, Plaintiff responded by explaining that he had found his friend dead and was a suspect in the friend's death; he had been assaulted on the job; and he was "basically stressed out, burnt . . . out" and "was going down because of these issues." (R. 536.) Plaintiff asserted that "instead of being 100 percent [he] was basically 15, 20 percent." (R. 536.) He later mentioned the "attempt on [his] life at [his] home." (R. 538.) Plaintiff believed his friend's death "was very detrimental to [him] psychologically," and that the medical record did not accurately reported everything he discussed with his physician. (R. 544.) Plaintiff also claimed that side effects he experienced from his medication during the period of disability included weight fluctuation, inability to operate vehicles or machinery, and feeling "zombified." (R. 544-45.)

As before, a vocational expert ("VE") testified at the 2004 hearing. ALJ Rebsamen posed the following hypothetical question to the VE, Richard Marron:

> Hypothetically, if we have a male . . . let's say in his late thirties. Eleven grades of education, past work as indicated by the record. . . . [I]f that individual exertionally could handle weights at the light level at least, which would be up to 20 pounds occasionally and less than that frequently. During a normal eight-hour day with normal breaks could sit six hours out of an eight-hour day. With normal breaks could stand or walk six hours out of an eight-hour day. Mentally, would have slight limitations in activities of daily living. Would have slight difficulties maintaining social function. Would seldom have deficiencies of

concentration, persistence, or pace. Would never have episodes of deterioration or decompensation. Could that individual perform any of the [Plaintiff's] past jobs?

(R. 549-50.) In response, the VE asserted that according to Plaintiff's testimony and the information in the record, Plaintiff would be able to resume work as an automobile salesperson,[9] as a telemarketer, in data entry,[10] in shipping and receiving, and as a parking lot attendant. (R. 550.) The VE testified that Plaintiff would not be able to work as a forklift operator or a general laborer, however. (R. 550.) The ALJ then posed the following second hypothetical: "This individual, as a result of a combination of physical and mental maladies, could not complete a normal workday or workweek without interruption. Are there any jobs that individual could perform?" (R. 550.) The VE simply responded, "No, sir." (R. 551.)

On July 28, 2004, ALJ Rebsamen issued a written determination denying Plaintiff's disability claim on the ground that Plaintiff was "fully able to perform all his past relevant work as an auto sales person, telemarketer, data entry clerk, shipping and receiving clerk and parking lot attendant." (R. 245.) Following the five-step test prescribed by the Social Security regulations, *see* 20 C.F.R. §§ 404.1520, 416.920, the ALJ determined that Plaintiff was not employed from April 15, 1998, through January 1, 2000; and that Plaintiff suffered from "severe" major depressive disorder, PTSD, panic disorder with agoraphobia, and borderline intellectual functioning. (*Id.*) In reaching the latter conclusion, the ALJ noted that he was departing from the state agency's assessment that Plaintiff's mental impairments were not severe based on the report of a non-examining psychologist, Dr. Casterline. (R. 244.) The ALJ explained that he gave greater weight to examining and treating

---

[9] It appears that the vocational expert was confused as to Plaintiff's testimony about his prior occupation. Plaintiff testified that he had sold shoes, not automobiles. (R. 537.) The ALJ's incorporation of these findings into his adverse decision (R. 245), is troublesome because the ALJ's conclusion that Plaintiff had the residual functional capacity to meet the higher demands of an automobile salesperson is unsupported by substantial evidence in the record.

[10] In addition to the prior occupations Plaintiff had noted in the first administrative hearing, Plaintiff claimed to have worked in telemarketing and to have done data entry for a law firm in Little Rock, Arkansas. (R. 540.)

experts "when the latter conflicted with the non-examining source opinions (and, of course, were supported by the objective evidence)." (*Id.*)

The ALJ nevertheless concluded that during the relevant time period, Plaintiff did not suffer from any condition that, alone or in combination with others, was "listed in [Appendix 1]." (R. 245.) The ALJ explained this determination by stating only that "[Plaintiff's] impairments may cause . . . relatively mild symptoms associated with his mental and emotional impairments, but the evidence as a whole does not substantiate the existence of pain or other nonexertional limitation which is constant, unremitting, or disabling." (R. 243.) The ALJ further concluded that Plaintiff "had the residual functional capacity . . . for exceptionally light work further compromised by a slight restriction in his daily activities, slight difficulty maintaining social functioning, and deficiencies in concentration, persistence and pace seldom resulting in failure to complete tasks in a timely manner." (R. 245.) Based on the expert vocational testimony, the ALJ concluded that during the relevant period, Plaintiff was able to perform his past relevant work, and therefore was not disabled within the meaning of the Social Security Act. (*Id.*)

Additionally, the ALJ found that Plaintiff's "complaints of severe, unremitting and disabling . . . limitation [were] not substantiated by any record evidence and [were] not credible." (R. 245.) In making this credibility assessment, the ALJ relied on the lack of objective medical evidence supporting Plaintiff's complaints, the difference between the statements Plaintiff made about his symptoms to Dr. Zedar and those he made to Dr. Felker, the evidence suggesting Plaintiff's lack of commitment to treatment and ulterior motives for seeking treatment in the first place (his attempt to obtain disability benefits), and the apparent improvement in Plaintiff's condition within a few months of therapy. (R. 242-43.) The ALJ also noted that Plaintiff did not return to therapy after early September 1999 (R. 242), but that statement is factually inaccurate; the record demonstrates that Plaintiff continued to see Gardner until December 1999, and Dr. Zedar until January 2000.

Because Plaintiff did not file exceptions to the ALJ decision with the Appeals Counsel and the Appeals Counsel did otherwise assume jurisdiction, the ALJ's adverse determination became the Commissioner's final decision on July 28, 2004. *See* 20 C.F.R. §§ 404.984(d), 416.1484(d).

### D. United States District Court for the Northern District of Illinois

Plaintiff appealed the second adverse decision to the United States District Court for the Western District of Arkansas, which transferred the case to the Eastern District of Arkansas. The documents from the Western District of Arkansas did not transfer to this court along with the documents from the Eastern District of Arkansas, but the court assumes the case was transferred between those districts because Plaintiff lived in Little Rock, Arkansas, which is situated in the Eastern District. Magistrate Judge Henry Jones, Jr. of the Eastern District of Arkansas ordered the case transferred to this court when Plaintiff notified the judge that he no longer lived in Little Rock, but had moved to Chicago, Illinois. (May 28, 2009 Order [59].)

**DISCUSSION**

### I. Legal Framework

In reviewing the ALJ's decision, the court applies a deferential standard of review, asking whether the ALJ's decision is supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Substantial evidence is that which a "'reasonable mind might accept as adequate to support a conclusion.'" *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner*, 478 F.3d at 841. Further, "[t]he ALJ need not address every piece of evidence in the record but must 'build an accurate and logical bridge from the evidence to the conclusion.'" *Richards v. Astrue*, 370 F. App'x 727, 730 (7th Cir. 2010) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).

### A. Assessment of Disability Under the Five-Step Analysis

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security regulations set forth a mandatory five-step sequential analysis, *see* 20 C.F.R. §§ 404.1520, 416.920, which requires the ALJ to examine:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner], *see* 20 C.F.R. § 404, Subpt. P., App. 1; (4) whether the claimant can perform [his] past work; and (5) whether the claimant is capable of performing work in the national economy.

*Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009) (alterations in original) (quoting *Clifford*, 227 F.3d at 868).

In order to determine whether a claimant is capable of performing his past work or other work within the national economy (Steps 4 and 5), the ALJ must assess a claimant's residual functional capacity ("RFC"). *See* 20 C.F.R. §§ 404.1520(e), 404.1560(b)-(c), 416.920(e), 416.960(b)-(c); *Simila*, 573 F.3d at 513. "A claimant's RFC is 'the most [the claimant] can still do despite [his] limitations,' and the ALJ determines a claimant's RFC based on all the claimant's impairments and all the relevant evidence in the record." *Simila*, 573 F.3d at 513 (quoting 20 C.F.R. §§ 404.1545(a), 416.945(a)). If, at Step 4, the ALJ determines that the claimant can engage in past relevant work, he is not disabled. At Step 5, the ALJ "'assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work.'" *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011) (quoting *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008)). The claimant bears the burden of proof at Steps 1 through 4; the burden then shifts to the Commissioner at Step 5 to "establish that the claimant possesses the residual functional capacity to perform work that exists in a significant quantity in the national economy." *Id.* (footnote omitted) (citing *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005)).

19

## B.     Evaluating Mental Disability Under the "Special Technique"

In addition to the general five-step analysis required for assessing all disabilities (both physical and mental), Social Security regulations require an ALJ to follow a "special technique" to assess mental impairments. *See* 20 C.F.R. §§ 404.1520a, 416.920a. This special technique is "used to analyze whether a claimant has a medically determinable mental impairment and whether that impairment causes functional limitations." *Craft*, 539 F.3d at 674. Because a claimant is conclusively disabled "[if] a limitation is of listings-level severity," the "special technique" applies at Steps 2 and 3 of the more general five-step analysis. *Id.* (citing SSR 96-8p).

Under this technique, the ALJ must first evaluate the claimant's "pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable impairment(s)." 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). Where the ALJ determines that the claimant has a medically determinable impairment, the ALJ must then "rate the degree of functional limitation" in "four broad functional areas": "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *Id.* §§ 404.1520a(b)(2), (c)(3), 416.920a(b)(2), (c)(3). Courts refer to these functional areas as the "B criteria." *See, e.g.*, *Craft*, 539 F.3d at 674.

The first three functional areas are rated on a five-point scale of "none," "mild," "moderate," "marked," or "extreme." 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). The fourth functional area—episodes of decompensation—is rated on a four-point scale of "none," "one or two," "three," or "four or more." *Id.* After rating the relevant functional limitations in this way, the ALJ determines the severity of the claimant's impairment. *Id.* §§ 404.1520a(d), 416.920a(d). Generally, the claimant's impairment is "not severe" if the ALJ rated the degree of limitation in the first three functional areas as "none" or "mild" and in the fourth area as "none." *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Otherwise, the claimant's mental impairment is considered severe, in which case the ALJ determines whether the impairment "meets or is equivalent in severity to a listed mental

disorder." *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2).  If the claimant's mental impairment does not meet or exceed the severity of any listing, the ALJ must then assess the claimant's residual functional capacity.  *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3).

The ALJ must document application of the technique; his "written decision must incorporate the pertinent findings and conclusions based on the technique." *Id.* §§ 404.1520a(e)(4), 416.920a(e)(4).  Furthermore, "[t]he decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)." *Id.*  Finally, the decision must also "include a specific finding as to the degree of limitation in each of the functional areas." *Id.*

## II.     ALJ's Analysis of Plaintiff's Claim

Although Plaintiff himself neglected to raise the matter until filing his reply brief, the court turns first to his argument that the ALJ failed to follow the "special technique" under 20 C.F.R. § 404.1520a for evaluating mental impairments.  In this case, ALJ Rebsamen determined at Step 2 of the five-step analysis that Plaintiff suffered from "severe" major depressive disorder, PTSD, panic disorder with agoraphobia, and borderline intellectual functioning.  But the ALJ neither cited to nor applied the special technique.  Instead, the ALJ concluded that Plaintiff's mental impairments were severe without assessing the degree of functional impairment under the B criteria.  In concluding at Step 3 that Plaintiff's impairment did not meet or equal one of the impairments listed in Appendix 1, the ALJ merely stated that Plaintiff's "relatively mild symptoms associated with his mental and emotional impairments" did not substantiate the existence of a "nonexertional limitation which is constant, unremitting or disabling."  (R. 243.)  The ALJ did not specifically address the B criteria under § 12.04, for affective disorders, or under § 12.06, for anxiety related disorders.  The ALJ's failure is particularly disappointing because the magistrate judge's report and recommendation remanding the case, adopted by the Western District of Arkansas, explicitly drew the SSA's attention to the "special procedure" for assessing mental impairments.

Under similar circumstances, the Seventh Circuit has concluded that remand is necessary. For instance, in *Craft v. Astrue*, the Seventh Circuit ordered remand in a case where the ALJ denied a claim based on dysthymia, a chronic form of depression. 539 F.3d at 671-72. The court observed that the ALJ "jumped to the conclusion the dysthymia was severe without discussing [the claimant's] mental medical history or rating the severity of the four functional areas of limitation." 539 F.3d at 675. Although the ALJ included some of this analysis in the RFC, the Seventh Circuit cited Social Security Rule 96-8p for the proposition that "the RFC analysis is not a substitute for the special technique, even though some of the evidence considered may overlap." *Id.*; *see also* SSR 96-8p ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.").

In *Craft*, the government argued that the ALJ's failure to apply the special technique was harmless because the ALJ determined that claimant's dysthymia was severe and proceeded to consider whether it met or equaled a listed impairment. *Craft*, 539 F.3d at 675. The Seventh Circuit rejected that argument. In doing so, the court acknowledged that "failure to explicitly use the special technique may indeed be harmless error." *Id.* (citing *Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003)); *see also Richards*, 370 F. App'x at 730 (citing *Rabbers v. Comm'r SSA*, 582 F.3d 647, 654-57 (6th Cir. 2009)).[11] The error was not harmless, however, where "the ALJ's failure

_____

[11]     In *Rabbers*, the Sixth Circuit noted that several circuits "have been inclined to reverse and remand in cases where an ALJ failed to follow the special procedure of § 404.1520a." 582 F.3d at 655. The court observed that several of those circuits, including the Second, Seventh, and Eighth, "left open the possibility that noncompliance with § 404.1520a can be harmless in certain circumstances." *Id.* (citing *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008); *Craft*, 539 F.3d at 675; *Montgomery v. Shalala*, 30 F.3d 98, 100 (8th Cir. 1994)). Other circuits, however, "appeared to adopt a *per se* rule requiring remand in any case where an ALJ has failed to follow § 404.1520a and where the claimant has presented at least a colorable claim of mental impairment." *Id.* (citing *Shivel v. Astrue*, 260 F. App'x 88, 91 (10th Cir. 2008); *Selassie v. Barnhart*, 203 F. App'x 174, 176 (9th Cir. 2006); *Moore v. Barnhart*, 405 F.3d 1208, 1214 (11th Cir. 2005)). The Sixth Circuit adopted the harmless error approach. *Id.* at 661.

22

to consider the functional impairments during the special technique analysis was compounded by a failure of analysis during the mental RFC determination." *Craft*, 539 F.3d at 675. Specifically, the court was concerned with the ALJ's attempt to account for the claimant's mental impairments by limiting his RFC to unskilled work, without taking account of or weighing the medical evidence demonstrating that even unskilled work might have been beyond the plaintiff's capabilities. *Id.* at 677-78.

Subsequently, in an unreported decision, the Seventh Circuit again declined to find harmless an ALJ's failure to apply the special technique, even though the ALJ concluded at Step 2 that the claimant's "mild depression/anxiety" were "severe impairments." *Richards*, 370 F. App'x at 729. Although the ALJ did not explicitly refer to the special technique, she offered B criteria ratings at Step 4 of the general five-step analysis. *Id.* at 730. The ALJ did not, however, explain how she reached these conclusions. *Id.* Again, as in *Craft*, the *Richards* court noted that the ALJ's failure to apply the special technique was compounded by other errors in the ALJ's analysis. *Id.* Specifically, the court was "troubled that the ALJ rated [the claimant's] mental functional limitations without the benefit of any medical professional's assessment of her mental RFC." *Id.* The court noted that typically, before a case reaches the ALJ, a mental or psychological professional would complete a PRTF assessing the effects of the claimant's mental impairments on her functional capacity, but that Richards's case was unusual because "her initial application claimed only an eye impairment, and thus the state-agency physicians who reviewed her file evaluated only the effect of her visual limitations on her ability to work." *Id.* at 730-31.

The court concluded that the ALJ erred by reaching conclusions on an undeveloped record instead of "'solicit[ing] additional information to flesh out an opinion for which the medical support is not readily discernable.'" *Id.* at 731 (quoting *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004)). The court associated the ALJ's duty to solicit additional information with the stated goal of the special technique "to help the agency '[i]dentify the need for additional evidence to determine

impairment severity.'" *Id.* (quoting 20 C.F.R. § 404.1520a(a)(1)). Consequently, in the absence of any "expert foundation" for the ALJ's assigned ratings, the court could not "discern the necessary logical bridge from the evidence to the ALJ's conclusions." *Id.*

In the case before this court, the ALJ's only mention of the B criteria was in his hypothetical question to the VE, and in his subsequent conclusion at Step 4 that Plaintiff had the RFC for "exceptional light work further compromised by a slight restriction in his daily activities, slight difficulty maintaining social functioning, and deficiencies in concentration, persistence and pace seldom resulting in failure to complete tasks in a timely manner." (R. 245.) As noted above, however, the mere recitation of the B criteria at Step 4 is not sufficient to satisfy the ALJ's duty to apply the special technique at Steps 2 and 3. Furthermore, the ALJ mentioned only three of the four B criteria—he made no specific finding as to episodes of decompensation.

Even more troubling is the ALJ's failure to explain how he determined these ratings. It appears that he relied exclusively on the PRTF completed by Dr. Caterline, the non-examining state-agency psychologist: the ALJ's ratings are precisely the same as those in Dr. Caterline's PRTF ("sight" restriction of activities of daily living; "slight" difficulties in maintaining social functioning; and deficiencies of concentration, persistence, or perception "seldom" resulting in failure to complete tasks in a timely manner (R. 160.)). The ALJ did not mention the final B criterion (episodes of decompensation), presumably because Dr. Caterline's PRTF reported none.

The ALJ's exclusive reliance on this source, without a proper application of the ratings at Steps 2 and 3 or explanation of the ratings the ALJ did apply at Step 4, was in this case not harmless. As in *Craft* and *Richards*, the ALJ's misapplication of the special technique is compounded by another error in the disability analysis. Dr. Caterline completed her PRTF, upon which the ALJ's RFC determination relies, before Plaintiff was diagnosed with the conditions for which he now seeks disability compensation. The only medical history concerning Plaintiff's mental impairments available to Dr. Caterline at the time she completed the PRTF was Dr. Felker's

conclusion that Plaintiff suffered from a "somatic preoccupation." Dr. Felker, the consulting psychologist, had observed "depressive features," but did not diagnose Plaintiff with a depressive or anxiety disorder. Thus, Dr. Caterline applied the special technique to assess Plaintiff's somatic preoccupation, not Dr. Zedar's subsequent diagnoses of major depressive disorder, PTSD, and panic disorder with agoraphobia. Indeed, as the basis for her medical disposition, Dr. Caterline referred only to "Somatoform Disorders," not to "Affective Disorders" or "Anxiety Related Disorders." (R. 153.)[12] Thus, as in *Richards*, the ALJ's ratings for the B criteria at Step 4 of the analysis were made without any expert foundation for Plaintiff's RFC for the specific impairments claimed. The ALJ relied exclusively on a PRTF that addressed an unrelated impairment and did not identify another source of support within the Plaintiff's medical records for his conclusions. Although "there is no absolute requirement that an ALJ remand a case simply because a PRTF was not completed at the initial or reconsideration level," *Richards*, 370 F. App'x at 731, the court cannot discern the logical bridge from the evidence to the ALJ's conclusions. Consequently, the court must remand Plaintiff's disability claims predicated on mental impairment.

## III. Proceedings on Remand

On remand, the court expects the agency to reevaluate Lane's mental limitations and residual functional capacity with the benefit of an expert opinion. The court recognizes, however, that Plaintiff raised the specific argument concerning application of the special technique for the first time in his reply brief. Therefore, the court will stay the remand order for twenty-one days to give Defendant an opportunity to respond, should he choose to do so.

---

[12] Notably, at the time Dr. Casterline completed the PRTF, a somatoform disorder had to manifest at least three B criteria at the requisite degree to satisfy Listing 12.07, whereas Listings 12.04, for affective disorders, and 12.06, for anxiety disorders, required only two B criteria. The SSA has subsequently amended § 12.07 such that a claimant need satisfy only two B criteria to establish a somatoform disorder as a listed impairment. Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50780 (Aug. 21, 2000).

Because the court remands Plaintiff's claim for the failures in the ALJ's analysis, the court need not address Plaintiff's additional argument that the ALJ's determination was not based on substantial evidence or that the ALJ improperly concluded that Plaintiff's mental impairments did not meet or exceed a listed impairment. The ALJ must reassess these conclusions after applying the special technique for mental impairments.

Additionally, because the court remands for further proceedings, the court need not decide whether the reasons the ALJ gave in support of his adverse credibility finding regarding Plaintiff were so "patently wrong" as to require remand independently. *See Scott*, 467 F.3d at 741. Nevertheless, the court notes several flaws "in the ALJ's credibility assessment so that the SSA does not repeat them on remand." *Id.* The court notes, first, that the credibility determination rested, at least in part, on an inaccurate factual assertion. The ALJ asserted that Plaintiff "did not return for treatment after early September 1999." (R. 242.) But the record demonstrates that Plaintiff's last appointment with Gardner was in early December 1999, and the last record from Dr. Zedar's office was early January 2000. Second, as the Social Security Administration has observed, the ALJ "must not draw any inference about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p. By this court's count, Plaintiff missed, cancelled, or arrived late to approximately ten appointments during the course of his year in treatment, but attended more than twenty appointments during that time. The ALJ did not appear to consider the explanation that Plaintiff gave for the cancelled and missed visits—transportation problems. Neither did the ALJ consider that Plaintiff's poor attendance might be a *symptom* of his panic disorder with agoraphobia. Indeed, Plaintiff reported experiencing a panic attack prior to attending at least one appointment, and when questioned by

Gardner about the missed appointments, Plaintiff became defensive and told Gardner that she did not understand what Plaintiff was experiencing.

## CONCLUSION

For the reasons above, the court remands Plaintiff's disability claims predicated on mental impairment for further proceedings consistent with this opinion. Accordingly, the court declines Plaintiff's invitation to find that he is entitled to disability benefits as a matter of law. The court stays the remand order for twenty-one days to give the government an opportunity to respond.


ENTER:

Dated: May 8, 2012

_____
REBECCA R. PALLMEYER
United States District Judge